IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TYRONE TIDWELL | CRIMINAL ACTION<br>NO. 94-353 |

**MEMORANDUM OPINION**

**Rufe, J.**                                                                                                   **August 5, 2020**

Tyrone Tidwell, a 62-year-old terminally ill defendant with a life expectancy of less than a year, who has served close to 26 years of a sentence of life imprisonment, has filed a motion to reduce sentence pursuant to the compassionate release provision of the First Step Act, 18 U.S.C. § 3582(c)(1)(A). Tidwell's motion is based on his illnesses—which include his metastatic (stage IV) prostate cancer, hepatitis C, and hypertension—the COVID-19 pandemic, and his significant rehabilitation in prison. The government opposes Tidwell's motion. Having carefully reviewed the parties' submissions, and the available record, the Court will grant Tidwell's motion.

**I.    BACKGROUND**

Between 1989 and 1991, Tidwell ran a drug distribution network in Philadelphia, Pennsylvania.[1] On September 7, 1994, a federal grand jury returned a 23-count indictment that charged Tidwell with one count of conspiracy to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 846, one count of engaging in a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848, two counts of murder in furtherance of a CCE in violation of 21 U.S.C. § 848(e)(1)(A), six counts of possession with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1), three counts of tax evasion in

---

[1] Presentence Report at 2.

violation of 26 U.S.C. § 7201, nine counts of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), and one count of criminal forfeiture pursuant to 21 U.S.C. § 853(a).[2] Tidwell has been in custody since September 8, 1994.

On December 4, 1996, several days into his trial, Tidwell informed the District Court judge that he wished to change his plea to guilty.[3] One year after his guilty plea, on December 4, 1997, the District Court judge "vacated the conspiracy conviction (Count 1) and sentenced Tidwell to life imprisonment on the continuing criminal enterprise charge (Count 2), life imprisonment without the possibility of parole on the murder charges (Counts 3 and 4), 40 years' incarceration on each of the possession with intent to distribute charges (Counts 5-10), five years' incarceration on each of the tax evasion charges (Counts 11-13), and ten years' incarceration on each of the charges of possession of a firearm by a convicted felon (Counts 14-22)," all to run concurrently.[4]

Much has changed in the last quarter-century. Tidwell is now 62 years old, he suffers from metastatic (stage IV) prostate cancer, hepatitis C, and hypertension, and he has less than a year to live. A pandemic is sweeping across the world, and it has infiltrated the Federal Medical Center, Butner ("FMC Butner")—where Tidwell is serving his sentence. Tidwell has also rehabilitated himself into a "model inmate" who no longer poses a danger to the community. Based on these changed circumstances, Tidwell seeks compassionate release from federal custody.

---

[2] *See United States v. Tidwell*, No. 94-353, 2000 WL 1886581, at *1 (E.D. Pa. Dec. 12, 2000), *aff'd*, 521 F.3d 236 (3d Cir. 2008).

[3] *See United States v. Tidwell*, 521 F.3d 236, 238 (3d Cir. 2008).

[4] *Tidwell*, 2000 WL 1886581, at *1. On July 3, 2017, this case was reassigned to this Court. *See* Doc. No. 526.

## II. LEGAL STANDARD

"A court generally may not correct or modify a prison sentence once it has been imposed, unless permitted by statute or by Federal Rule of Criminal Procedure 35."[5] One statute that permits such modifications is 18 U.S.C. § 3582 (c)(1)(A)(i), which, as amended by the First Step Act of 2018, allows "prisoners the right to file their own motions for a sentence reduction if they first exhaust the statute's procedures for initially making a request to the warden to file a motion on their behalf."[6] "Once a defendant's administrative remedies are exhausted, a court may grant compassionate release based upon: consideration of the factors set forth in 18 U.S.C. § 3553(a); a finding that 'extraordinary and compelling reasons warrant such a reduction'; and a determination that the reduction is 'consistent with applicable policy statements issued by the Sentencing Commission.'"[7]

## III. DISCUSSION

### A. Whether Tidwell has Satisfied the Exhaustion Requirement

"The Compassionate Release Statute was originally enacted as part of the Parole Reorganization Act of 1976" and, "as part of the Comprehensive Crime Control Act of 1984, [Congress] enacted the modern form of the Compassionate Release Statute contained in 18 U.S.C. § 3582."[8] In both the 1976 and the 1984 compassionate release provisions, the Bureau of Prisons ("BOP") acted "as a gatekeeper for all compassionate release motions."[9] In order to

---

[5] *United States v. Van Sickle*, No. 18-250, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020) (citing *United States v. Penna*, 315 F.3d 509, 511 (9th Cir. 2003)).

[6] *United States v. Hill*, 19-38, 2020 WL 2542725, at *1 (D. Conn. May 19, 2020) (citing *United States v. Almontes*, 2020 WL 1812713, at *1 (D. Conn. April 9, 2020)).

[7] *United States v. Bogdanoff*, No. 12-0190-1, 2020 WL 2307315, at *3 (E.D. Pa. May 8, 2020).

[8] Shon Hopwood, *Second Looks & Second Chances*, 41 CARDOZO L. REV. 83, 100 (2019) (citation omitted); *see also United States v. Osorto*, No. 19-381, 2020 WL 2323038, at *3 (N.D. Cal. May 11, 2020).

[9] *United States v. Connell*, No. 18-281, 2020 WL 2315858, at *2 (N.D. Cal. May 8, 2020).

obtain relief, "[a] defendant would petition the BOP to seek compassionate release on his or her behalf, and, if the BOP deemed the defendant's petition worthy, it would subsequently move the sentencing court for relief."[10] "[A]bsent such a motion, sentencing courts had no authority to modify a prisoner's sentence for extraordinary and compelling reasons."[11]

In 2018, recognizing the BOP's "grim history" of approving compassionate release requests,[12] and "in an effort to expand the use of compassionate release sentence reductions,"[13] Congress passed the First Step Act. "The title of the First Step Act's provision that enacted [the] exhaustion regime is 'Increasing the Use and Transparency of Compassionate Release'"[14] and under the new regime, "[t]he exhaustion requirement is met if the defendant establishes either (1) that the Bureau of Prisons denied his or her request that it bring a compassionate-release motion and he or she fully exhausted all administrative appeal rights with respect to that denial, or (2) that the warden of the facility took no action on his or her request for the filing of a compassionate-release motion within 30 days of receiving it."[15] Significantly, "Congress intended the 30-day exhaustion period to be an 'accelerant,' not a barrier, to judicial review."[16]

On December 18, 2019, Tidwell filed a request to the warden of FMC Butner for compassionate release based on his stage IV prostate cancer.[17] The warden did not act on this

---

[10] *Id.* at 1.

[11] Hopwood, *supra* note 8, at 101.

[12] *Osorto*, 2020 WL 2323038, at *4.

[13] Hopwood, *supra* note 8, at 106.

[14] *United States v. Scparta*, No. 18-578, 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) (quoting Pub. L. No. 115-391, 132 Stat. 5339 (2018)).

[15] *United States v. Cassidy*, No. 17-116S, 2020 WL 1969303, at *2 (W.D.N.Y. Apr. 24, 2020) (citing 18 U.S.C. § 3582 (c)(1)(A)(i)).

[16] *Connell*, 2020 WL 2315858, at *4 (quoting *United States v. Russo*, No. 16-441, 2020 WL 1862294, at *1 (S.D.N.Y. Apr. 14, 2020)).

[17] Ex. A, Motion to Reduce Sentence [Doc. No. 545].

request until February 27, 2020—71 days later—when he sent a letter to the BOP Assistant Director/General Counsel "recommending [that] consideration be given" to Tidwell's request.[18] A month later, the request was denied.[19] On May 12, 2020, Tidwell filed his Motion to Reduce Sentence in this Court.

Tidwell appears to have satisfied the exhaustion requirement—the warden took no action on his request within 30 days of receiving it *and*, in a final administrative decision, the BOP denied his request.[20] Nonetheless, the government argues that Tidwell's request to the warden did not exhaust his administrative remedies because the request, which was filed before the COVID-19 pandemic, did not mention COVID-19. According to the government, the BOP should have the opportunity to reevaluate Tidwell's request in light of COVID-19.[21]

The Court rejects the government's argument for two reasons. First, Tidwell's request to the warden was predicated on his serious health conditions. He now seeks relief based on those same conditions; the only difference is that the COVID-19 pandemic has amplified the risk to his health.[22] "Asking [Tidwell] to restart his process because of the COVID-19 pandemic would be tantamount to telling inmates that they must restart the process each time their condition deteriorates. That, clearly, is not the purpose of the statute."[23]

---

[18] Ex. B, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-2].

[19] Ex. B, Motion to Reduce Sentence [Doc. No. 545].

[20] A denial of a compassionate release request by the General Counsel of the BOP "constitutes a final administrative decision" and "an inmate may not appeal the denial through the Administrative Remedy Procedure." 28 C.F.R. § 571.63(d).

[21] Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 14.

[22] *See United States v. Smith,* No. 07-3038, 2020 WL 2844222, at *7 (N.D. Iowa June 1, 2020).

[23] *Id.*

5

As explained above, Congress's unmistakable goal in passing the First Step Act was to "increase the use of compassionate release"[24] and the way that "Congress chose to achieve this goal" was by "chang[ing] the process by which compassionate release could be obtained"[25] with the intent for "the judiciary to take on the role that the BOP once held under the pre-First Step Act Compassionate Release Statute to be the essential adjudicator of compassionate release requests."[26] Under the government's theory, every change in Tidwell's condition or in the extent of COVID-19 at Butner would require a new request so that the BOP could assess the exact risk at that moment.[27] The Court will not create additional barriers when the intent of the First Step Act was to reduce them.

---

[24] *United States v. Ebbers*, No. 02-1144-3, 2020 WL 91399, at *7 (S.D.N.Y. Jan. 8, 2020).

[25] *Osorto*, 2020 WL 2323038, at *4 ("The First Step Act made no change to the substantive standard for compassionate release eligibility.").

[26] Hopwood, *supra* note 8, at 107.

[27] For example, suppose that Tidwell had filed the instant motion on February 23, 2020, after COVID-19 cases had been diagnosed in several states, and based on the government's position, the Court immediately denied the motion. *See* Daniel B. Jernigan, et. al., CENTERS FOR DISEASE CONTROL AND PREVENTION, *Update: Public Health Response to the Coronavirus Disease 2019 Outbreak — United States, February 24, 2020*, https://www.cdc.gov/mmwr/volumes/69/wr/mm6908e1 htm (last visited August 3, 2020). If Tidwell then filed a new request to the BOP that included the risk of COVID-19 and, after 30 days without the warden acting on the request, filed a new motion in this Court that included an increased new risk based on COVID-19 infiltrating the federal prison system on March 21, 2020 and the Butner Federal Correctional Complex on March 30, 2020, according to the government's position, the Court would again have to deny Tidwell's motion in order to allow the BOP to evaluate how the more particularized risk of COVID-19 in the prison system impacts him. *See* Michael Balsamo, *First Federal Inmate Tests Positive for Coronavirus, AP Reports*, BLOOMBERG, https://www.bloomberg.com/news/articles/2020-03-21/ap-exclusive-1st-fed-inmate-tests-positive-for-coronavirus (March 21, 2020); Jonas Pope IV, *Two inmates at federal prison in NC test positive for COVID-19*, NEWS AND OBSERVER, https://www.newsobserver.com/news/coronavirus/article241631776 html (March 30, 2020). This cycle could keep repeating itself based on when the first federal prisoner died from COVID-19, *see* Bill Hutchinson, *1st federal inmate dies in prison hit hard by coronavirus after heartbreaking plea to judge*, ABC NEWS, https://abcnews.go.com/US/1st-federal-inmate-dies-prison-hit-hard-coronavirus/story?id=69996161 (April 7, 2020), when a study first showed that cancer patients appear more vulnerable to COVID-19, *see* M. Dai, et al., *Patients with Cancer Appear More Vulnerable to SARS-COV-2: A Multi-Center Study During the COVID-19 Outbreak*, 10 CANCER DISCOVERY 6 (Apr. 28, 2020), https://cancerdiscovery.aacrjournals.org/content/10/6/783?iss=6, when reports indicated that six inmates at the Butner complex died from COVID-19 over an eight-day period, *see* Dan Kane, *Butner Federal Prison Begins Mass COVID Testing After Six Inmates Die in Eight Days*, NEWS AND OBSERVER (June 3, 2020), https://www newsobserver.com/news/coronavirus/article243210251 html, or, at any time, if Tidwell obtains a new diagnosis showing that his cancer is progressing even more quickly than his previous diagnoses showed. Congress did not intend for situations where prisoners—including those like Tidwell with just months left to live—can be trapped in a never-ending loop of attempting to exhaust their administrative remedies.

Second, the BOP already had the opportunity to evaluate Tidwell's health conditions in light of the COVID-19 pandemic. By the time the warden forwarded Tidwell's request with the recommendation that it be given consideration, the COVID-19 pandemic was already a major concern, and the BOP surely was aware of it. As Tidwell points out, on the same day that his request was denied, Attorney General William Barr released a memo to the BOP with instructions to prioritize home confinement as an appropriate response to the COVID-19 pandemic.[28] Under these circumstances, Tidwell has met the exhaustion requirement.

### B. Whether "Extraordinary or Compelling Reasons" Warrant Reducing Tidwell's Sentence

Congress delegated the authority to define "extraordinary and compelling reasons" to the United States Sentencing Commission.[29] In accordance with this authority, the Sentencing Commission has issued a policy statement defining the term. Relevant to Tidwell's motion, the policy statement explains that, in two situations, the "medical condition of the defendant" provides "extraordinary and compelling reasons."[30] First, release may be warranted where:

> The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.[31]

Second, release may also be warranted where "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which

---

[28] FEDERAL BUREAU OF PRISONS, *COVID-19 Home Confinement Information*, https://www.bop.gov/coronavirus/ (last visited August 3, 2020).

[29] *See United States v. Rodriguez*, No. 03-271-1, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020) (citing 18 U.S.C. § 994(t)); *see also United States v. Perez*, No. 17-513-3, 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020).

[30] U.S.S.G. § 1B1.13, comment n.1.

[31] *Id.*

he or she is not expected to recover."[32] The policy statement also provides a catch-all provision for situations where "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the [other] reasons described."[33]

### 1. Tidwell's Terminal Illness

Tidwell suffers from metastatic prostate cancer—which the Sentencing Commission specifically cited as an example of a terminal illness constituting an extraordinary and compelling reason. Moreover, although "a specific prognosis of life expectancy" is not required, on Tidwell's February 3, 2020 "Reduction in Sentence / Compassionate Release Comprehensive Medical Summary," the section titled "Life Expectancy / Terminal Medical Condition" states that Tidwell "has been diagnosed with a terminal medical condition. Life expectancy is 18 months."[34] Therefore, even without considering the COVID-19 pandemic, extraordinary and compelling reasons exist to justify reducing Tidwell's sentence.

### 2. The Impact of COVID-19 on Tidwell's Terminal Illness

Moreover, although the government disputes whether Tidwell's stage IV cancer qualifies as a terminal illness, the government concedes that his cancer, combined with the COVID-19 pandemic, renders him "less able to protect himself against an unfavorable outcome from the disease" and constitutes an extraordinary and compelling reason.[35] As of August 2, 2020, there

---

[32] *Id.*

[33] *Id.*

[34] Ex. C, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 553] at 320; *see also id.* at 29; Ex. B, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-2] at 12 (warden explaining that: "Medical staff indicate inmate Tidwell has been diagnosed with a terminal condition. Inmate Tidwell has been diagnosed with Stage IV Prostate Cancer. Medical staff indicate his prognosis is eighteen months or less.").

[35] Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 24. The government argues that Tidwell does not have a terminal illness because the BOP Medical Director concluded that although Tidwell "does have a diagnosis of stage IV prostate cancer, he does not have end-of-life indicators that would establish a prognosis of terminal at this time." Ex. B, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-2] at 14. However, in addition to the prison medical staff determining

have been over 4.6 million confirmed cases of COVID-19 and over 154,000 deaths in the United States alone.[36] "Not all Americans, however, are equally at risk."[37] The Centers for Disease Control and Prevention ("CDC") has explained that "[p]eople with weakened immune systems are at higher risk of getting severely sick from SARS-CoV-2, the virus that causes COVID-19" and that "[t]hey may also remain infectious for a longer period of time than others with COVID-19."[38] The CDC has further explained that one condition that "can weaken a person's immune system" is "cancer."[39] One study concluded that patients with stage IV cancer are 5.58 times more likely to die than cancer-free people if they contract COVID-19.[40] The CDC has also explained that people with Hepatitis C and hypertension "might be at higher risk of severe illness from COVID-19."[41]

Because "[p]risons are ill-equipped to prevent the spread of COVID-19," Tidwell's risk increases again.[42] "People residing in close living quarters are especially vulnerable to COVID-

---

that Tidwell had a life expectancy of 18 months, the Sentencing Commission's policy statement provides that "a specific prognosis of life expectancy" is not required and the BOP Medical Director conceded that Tidwell suffers from stage IV prostate cancer.

[36] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Cases of Coronavirus Disease (COVID-19) in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us html (last visited August 3, 2020).

[37] *Martinez-Brooks v. Easter*, 20-00569, 2020 WL 2405350, at *3 (D. Conn. May 12, 2020).

[38] CENTERS FOR DISEASE CONTROL AND PREVENTION, *If You Are Immunocompromised, Protect Yourself From COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html (last visited August 3, 2020).

[39] *Id.*

[40] *See* Dai, et al., *supra* note 27; *see also United States v. Fandel*, No. 12-3009, 2020 WL 4284802, at *5 (N.D. Iowa July 27, 2020) (explaining that "numerous other courts have found that serious, active cancer is a health condition which, amid the pandemic, presents an extraordinary and compelling reason for release.").

[41] CENTERS FOR DISEASE CONTROL AND PREVENTION, *What to Know About Liver Disease and COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease html (last visited August 3, 2020) (hepatitis C); CENTERS FOR DISEASE CONTROL AND PREVENTION, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions html (last visited August 3, 2020) (hypertension).

[42] *Rodriguez*, 2020 WL 1627331, at *8.

19"[43] and "[j]ails and prisons represent unique and challenging environments in which to implement effective infection-control strategies"[44] such as "social distancing, frequently disinfecting shared surfaces, and frequently washing hands or using hand sanitizer."[45] As the CDC has further explained, "[c]orrectional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of [COVID-19] transmission among incarcerated/detained persons, staff, and visitors."[46]

This risk to Tidwell is not hypothetical. Although the rate of COVID-19 infections per 1,000 people in the United States is currently 13.55, in BOP facilities that rate is at least 74.13.[47] At FMC Butner, at least 11 inmates and 15 staff members have tested positive.[48] FMC Butner currently houses 886 inmates[49] even though its maximum occupancy capacity for inmates is

---

[43] Gregg S. Gonsalves, et al., *Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and other Federal, State and Local Leaders from Public Health and Legal Experts in the United States*, (March 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.

[44] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45(8) CLINICAL INFECTIOUS DISEASES 1047-1055, (Oct. 15, 2007), https://doi.org/10.1086/521910.

[45] *Rodriguez*, 2020 WL 1627331, at *8 (citing CENTERS FOR DISEASE CONTROL AND PREVENTION, *How to Protect Yourself*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html; Dr. Asaf Bitton, *Social distancing in the coronavirus pandemic — maintaining public health by staying apart*, BOSTON GLOBE (Mar. 14, 2020), https://www.bostonglobe.com/2020/03/14/opinion/social-distancing-coronavirus-pandemic-maintaining-public-health-by-staying-apart/).

[46] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited August 3, 2020).

[47] *See BOP-Reported Positive Tests for COVID-19 Nationwide*, Federal Defenders of New York, https://federaldefendersny.org/ (last visited August 3, 2020).

[48] FEDERAL BUREAU OF PRISONS, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited August 3, 2020); *Smith*, 2020 WL 2844222, at *11; *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (explaining that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."). There are six inmates and two staff members at FMC Butner who are currently positive for COVID-19.

[49] FEDERAL BUREAU OF PRISONS, *Population Statistics: Inmate Population Breakdown*, https://www.bop.gov/mobile/about/population_statistics.jsp (last visited August 3, 2020).

743,[50] and these crowded conditions increase again Tidwell's risk of transmission.[51] Moreover, alarming infection rates have also appeared in other facilities on the same BOP complex: 650 inmates and 16 staff members at Butner Low FCI, 3 inmates and 2 staff members at Butner Medium II FCI, and 204 inmates and 32 staff members at Butner Medium I FCI have tested positive.[52] Altogether, 24 inmates and one staff member at the Butner complex have died from the virus, a sobering fact.[53] Therefore "[w]ithout a doubt, COVID-19 is present at Butner FMC and the larger Butner Federal Correctional Complex."[54]

In sum, "[t]he BOP cannot adequately protect [Tidwell] from infection, especially in light of his vulnerability and the presence of COVID-19" at FMC Butner.[55] Therefore, because (as the government concedes) the combination of Tidwell's stage IV prostate cancer and the COVID-19 pandemic substantially diminishes Tidwell's ability to provide self-care at FMC Butner, "extraordinary and compelling reasons" exist to reduce Tidwell's sentence.

---

[50] BUREAU OF JUSTICE ASSISTANCE, *PREA Audit Report,* https://www.bop.gov/locations/institutions/buh/PREA_butner.pdf (last visited August 3, 2020).

[51] Gonsalves, et al., *supra* note 45 (explaining that "[p]eople residing in close living quarters are especially vulnerable to COVID-19.").

[52] FEDERAL BUREAU OF PRISONS, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited August 3, 2020); *see also Smith*, 2020 WL 2844222, at *11.

[53] *See id.*

[54] *Smith*, 2020 WL 2844222, at *11; *see also United States v. Myles*, No. 11-253, 2020 WL 4350604, at *3 (M.D. Tenn. July 29, 2020). The government argues that FMC Butner should be viewed in isolation and that the Court should not consider "notable outbreaks" at the other facilities on the campus. *See* Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 25 n.17. However, the outbreaks at the Butner complex began at one prison and then spread to another one of the prisons. *See Butner Federal Prison Begins Mass COVID Testing After Six Inmates Die in Eight Days*, *supra* note 28 ("The complex's first major outbreak happened at one of its two medium-security prisons, then spread to an adjacent minimum-security camp."). Moreover, the government concedes that "[u]nfortunately and inevitably, many inmates at various institutions have become ill, and more likely will in the weeks ahead." *See* Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 19.

[55] *Rodriguez*, 2020 WL 1627331, at *9.

### C. Whether a Sentence Reduction is Consistent with the Section 3553(a) Factors

Having concluded that "extraordinary and compelling reasons" exist, the Court must still consider the relevant § 3553(a) sentencing factors and "assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release."[56] The applicable factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>  (B) to afford adequate deterrence to criminal conduct;
>  (C) to protect the public from further crimes of the defendant; and
>  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>  . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.][57]

Although the government concedes that there are "extraordinary and compelling reasons," the government argues that Tidwell is not entitled to relief based on these factors.

### 1. Nature and Circumstances of the Offense and History and Characteristics of the Defendant

Based on "the extremely violent nature of [Tidwell's] crimes" and Tidwell's criminal history, the government argues that this factor weighs heavily against granting Tidwell's request for compassionate release.[58] The Court agrees that the nature and circumstances of Tidwell's underlying offenses are extremely serious and, as the government points out, between 1978—

---

[56] *Ebbers*, 2020 WL 91399, at *7.

[57] *Rodriguez*, 2020 WL 1627331, at *11–12 (quoting 18 U.S.C. § 3553(a)).

[58] Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 26–27.

when he was 19 years old—and 1994, Tidwell incurred six convictions for offenses including aggravated assault, knowing possession of a controlled substance, possession with intent to distribute, carrying a firearm without a license, and retail theft.[59] However, the Court's evaluation of Tidwell's history and characteristics is not frozen in time—the Supreme Court has explained that any review of the § 3553(a) factors must consider the "most up-to-date picture" of the defendant's "history and characteristics," including evidence of rehabilitation.[60]

Tidwell has shown significant rehabilitation in prison. During his decades in prison, Tidwell has taken 34 educational courses[61] and he has a "minimal, non-violent disciplinary record."[62] Correctional Counselor T. Pike wrote in a memorandum included in Tidwell's request to the BOP for compassionate release that Tidwell "is a model inmate at this institution. His work performance is above average and is [reflected] in his work evaluations. His work ethics are a model for other inmates. Inmate Tidwell also helps newly incarcerated inmates adjust to prison life by giving them guidance and counseling. Inmate Tidwell also maintains a positive

---

[59] *See* Presentence Report at 9–11.

[60] *Pepper v. United States*, 562 U.S. 476, 491–92 (2011); *see also United States v. Parker*, No. 98-749, 2020 WL 2572525, at *11 (C.D. Cal. May 21, 2020). Although Congress has provided that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason," 28 U.S.C. § 994(t), "rehabilitation may be considered with other factors." *Rodriguez*, 2020 WL 1627331, at *10 (quoting *United States v. Brown*, 411 F. Supp. 3d 446, 449 (S.D. Iowa 2019)); *see also* Hopwood, *supra* note 8, at 103 ("Congress no doubt limited the ability of rehabilitation *alone* to constitute extraordinary circumstances, so that sentencing courts could not use it as a full and direct substitute for the abolished parole system. Congress, however, contemplated that rehabilitation could be considered with other extraordinary and compelling reasons sufficient to resentence people in individual cases. Indeed, the use of the modifier 'alone' signifies that rehabilitation could be used in tandem with other factors to justify a reduction.").

[61] Ex. E, Motion to Reduce Sentence [Doc. No. 545].

[62] *United States v. Decator*, No. 95-202, 2020 WL 1676219, at *4 (D. Md. Apr. 6, 2020). Prison records show that Tidwell has been sanctioned just 4 times—in 1998 for being absent from a work assignment, in 1999 for refusing a work assignment, in 2010 for refusing to obey an officer, and in 2019 for receiving money from another inmate's family. *See* Ex. A, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-1].

attitude with staff and peers."[63] Tidwell's PATTERN[64] score indicates that his "recidivism risk level" is "low."[65] In light of Tidwell's rehabilitation and model behavior during his incarceration, this factor tilts in favor of reducing Tidwell's sentence.

### 2. The Need for the Sentence Imposed

"As to the Section 3553(a)(2) factor, the need for a sentence must be sufficient, but not greater than necessary, to serve the purpose of 'just punishment, deterrence, protection of the public, and rehabilitation.'"[66] The government asserts that, based on Tidwell's status as a "violent drug offender[]," his continued incarceration is necessary.[67] The Court disagrees.

Tidwell is a terminally ill man who has already served over 25 years in federal custody. This 25-year duration "has consumed a large part of his life and by any measure represents a very substantial punishment that reflects the seriousness of his offenses and the need for general or specific deterrence."[68] This lengthy time "is also a period of time that promotes respect for the law and provides just punishment for his offenses," even where the defendant was originally sentenced to life imprisonment.[69]

---

[63] Ex. F, Motion to Reduce Sentence [Doc. No. 545].

[64] Prisoner Assessment Tool Targeting Estimated Risk and Needs. According to the BOP's website, "[t]he risk and needs assessment system is used to determine the risk and needs of inmates in BOP custody. Specifically, the system determines the recidivism risk of each inmate and assigns a recidivism risk score of minimum, low, medium, or high risk. The system also assesses each inmate and determines, to the extent practicable, the inmate's risk of violent or serious misconduct." FEDERAL BUREAU OF PRISONS, *First Step Act - Frequently Asked Questions*, https://www.bop.gov/inmates/fsa/faq.jsp#fsa_system (last visited June 12, 2020).

[65] Ex. G, Motion to Reduce Sentence [Doc. No. 545].

[66] *United States v. Regas*, 91-57, 2020 WL 2926457, at *5 (D. Nev. June 3, 2020) (quoting *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017)); *see also Parker*, 2020 WL 2572525, at *12.

[67] Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 27.

[68] *Regas*, 2020 WL 2926457, at *5 (quoting *Parker*, 2020 WL 2572525, at *12).

[69] *Id.* (granting compassionate release to a defendant found guilty of CCE who served 27 years of a life sentence) (quoting *Parker*, 2020 WL 2572525, at *12) (granting compassionate release to a former narcotics officer who formed a drug gang and served 22 years of his life sentence); *see also United States v. Gray*, 416 F. Supp. 3d 784, 790 (S.D. Ind. 2019) (granting compassionate release to an inmate who served "nearly two decades" of a life sentence); *United States v. Wong Chi Fai*, No. 93-1340, 2019 WL 3428504, at *4 (E.D.N.Y. July 30, 2019) (granting compassionate release to a terminally ill inmate who served 26 years of his life sentence); *United States v.*

14

The government also argues that Tidwell's "medical records belie" that he is too ill to engage in criminal activity.[70] According to the government, because decades ago Tidwell ran a drug operation, "regardless of physical state, Tidwell is certainly functionally capable of engaging in the same conduct for which he is incarcerated."[71] The government presents no evidence to support the theory that Tidwell would engage in similar conduct after release despite his record as a model inmate and while undergoing chemotherapy for stage IV prostate cancer. As almost any inmate, while alive, is at least theoretically capable of engaging in illegal conduct, the government's position would vitiate Congress's clear intent to allow terminally ill inmates to obtain compassionate release.

Moreover, Tidwell will be able to obtain needed medical care upon release. Tidwell has indicated that, if released, he will live with his daughter in Baltimore, Maryland. On Tidwell's Reduction in Sentence Release Plan Review, a social worker reported that Tidwell's daughter confirmed that he could live at her home, that she is aware of Tidwell's medical condition, and that she is prepared to provide support and care for him.[72] Tidwell's counsel has stated that Tidwell will continue his cancer treatment at either the University of Maryland or Johns Hopkins University.[73] Therefore, after considering the Section 3553(a)(2) factor, the Court concludes that

---

*Pickard*, No. 00-40104, 2020 WL 4260634, at *5 (D. Kan. July 24, 2020) ("Pickard's offenses were serious, but having spent two decades in prison he has been seriously punished."); *United States v. Gluzman*, No. 96-323, 2020 WL 4233049, at *18 (S.D.N.Y. July 23, 2020).

[70] Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 27.

[71] *Id.*

[72] *See* Ex. B, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-2] at 6–7. Tidwell's counsel has informed the Court that a United States Probation Officer in the District of Maryland has performed a home assessment and has approved the residence. *See* Tidwell's Motion to Reduce Sentence [Doc. No. 544] at 21 n.72.

[73] Tidwell's Reply to Government's Response to Motion to Reduce Sentence [Doc. No. 555] at 11. The government argues that Tidwell's "prostate cancer is appropriately managed at the facility, and likely even better managed than it would be if he were left to fend for himself and find treatment on his own." Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 25. The inquiry, however, is not whether the prison is able to manage the defendant's medical conditions; rather the Court must determine whether incarceration is *needed*

prolonging Tidwell's incarceration under the current conditions would contravene § 3553(a)'s requirement to "impose a sentence sufficient, but not greater than necessary to comply with" the statutory purposes of punishment.[74]

### 3. *The Need to Avoid Unwarranted Sentencing Disparities*

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing."[75] However, "§ 3553(a)(6) disallows '*unwarranted* sentence disparities,' not all sentence differences."[76] Congress originally passed § 3582(c)(1)(A)(i) as a "safety valve" to reduce a sentence in "the unusual case in which the defendant's circumstances are so changed . . . that it would be inequitable to continue the confinement of the prisoner."[77] As explained above, Congress's unmistakable goal in passing the First Step Act was to "increase the use of compassionate release."[78] Therefore, when a defendant demonstrates that "extraordinary and

---

to provide the defendant with necessary medical care. As Tidwell has represented that he will be continue his treatment at either the University of Maryland or Johns Hopkins University—both excellent hospitals—Tidwell does not need to remain in prison to receive care.

[74] *Rodriguez*, 2020 WL 1627331, at *12 (quoting 18 U.S.C. § 3553(a)). The government appears to argue that continued incarceration is necessary because Tidwell would be more at risk of contracting COVID-19 in Baltimore than in federal custody. *See* Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552] at 25–26. In support, the government relies on the total number of COVID-19 cases in Baltimore. *See id.* at 26. However, the government fails to appreciate that Baltimore has a population of about 593,490 while there are only 128,601 federal inmates across all BOP-managed institutions and 886 inmates at FMC Butner. *See* UNITED STATES CENSUS BUREAU, *QuickFacts, Baltimore city, Maryland (County)*, https://www.census.gov/quickfacts/fact/table/baltimorecitymarylandcounty/AGE295218 (last visited August 3, 2020); FEDERAL BUREAU OF PRISONS, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited August 3, 2020). Regardless, upon release, Tidwell will be confined to his daughter's home where he will be able to socially distance from all non-family members while, on the Butner complex, the BOP has been unable to stop the spread of COVID-19.

[75] *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) (citations omitted).

[76] *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (emphasis added by Seventh Circuit).

[77] S. Rep. No. 98-225, at 121 (1983).

[78] *Ebbers*, 2020 WL 91399, at *7.

compelling reasons" warrant a sentence reduction, the ensuing sentence disparity "has been authorized by Congress, and is therefore a 'warranted' disparity."[79]

Regardless, the "need to avoid unwarranted sentence disparities" is "just one factor (if relevant) that should be balanced against the others (again, if relevant)."[80] Considering that Tidwell has already served close to 26 years in prison and has an estimated 12 months left to live, any sentencing disparity that would result from granting Tidwell's motion is outweighed by the factors that support Tidwell's compassionate release.[81] In sum, the § 3553(a) sentencing factors do not outweigh the extraordinary and compelling reasons that justify granting Tidwell's request for compassionate release.

### D. Whether a Sentence Reduction is Consistent with the Applicable Sentencing Commission Policy Statements

The relevant Sentencing Commission policy statements require the Court to determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[82] Pursuant to § 3142(g), courts must consider a series of factors—weighing both the defendant's possible danger to the community and the defendant's likelihood to appear at trial—when deciding whether to release a defendant pre-trial. "The

---

[79] *United States v. Gutierrez*, 251 F. App'x 804, 806 (3d Cir. 2007) (quoting *United States v. Vargas*, 477 F.3d 94, 98 & n.9 (3d Cir. 2007)); *Cf. United States v. Arrelucea-Zamudio*, 581 F.3d 142, 151 (3d Cir. 2009) (explaining that "express congressional . . . directive[s]" can "constrain a sentencing judge's discretion to vary from the Guidelines.").

[80] *United States v. Jones*, 326 F. App'x 90, 92 (3d Cir. 2009) (quoting *United States v. Charles*, 467 F.3d 828, 833 (3d Cir. 2006)); *see also Pepper*, 562 U.S. at 504 (explaining that courts should not "elevate" this factor "above all others.").

[81] The Court also notes that Tidwell's sentence cannot be compared to those of other defendants with similar offense profiles because Tidwell's incarceration has been significantly more uncomfortable and challenging than most inmates' due to his health conditions, which are not shared by the majority of similar defendants. *See United States v. McGraw*, No. 02-18, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019) ("Finally, Mr. McGraw has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served by most inmates."); *see also United States v. Beck*, 425 F. Supp. 3d 573, 586 (M.D.N.C. 2019).

[82] U.S.S.G. § 1B1.13(2).

factors that weigh danger to the community include 'the nature and circumstances of the offense charged,' 'the history and characteristics of the person,' including 'the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history,' and 'the nature and seriousness of the danger to any person or the community that would be posed by the person's release.'"[83]

As explained above, although Tidwell's offenses were extremely serious and he has an extensive criminal history, after careful consideration of the relevant factors, the Court holds that the strong evidence of rehabilitation and of seriously impaired health shows that Tidwell does not pose a danger to others. Tidwell is 62 years old with about 12 months left to live, and his health is deteriorating rapidly. Tidwell has built a record as a "model inmate," he has minimal disciplinary infractions over his many years in prison, and the BOP has designated him as a low risk to reoffend. Tidwell has strong family ties, including his two daughters and his brother.[84] His family is aware of his prognosis, are prepared to care for him, and he will be living with one of his daughters and her family.[85] Any risk of harm to the community is further mitigated by the conditions the Court will impose on Tidwell's compassionate release—he will remain in home confinement and be subject to electronic monitoring by the United States Probation Office.[86]

---

[83] *Rodriguez*, 2020 WL 1627331, at *11 (quoting 18 U.S.C. § 3142(g)).

[84] *See* Ex. B, Government's Response in Opposition to Tidwell's Motion to Reduce Sentence [Doc. No. 552-2] at 4.

[85] *See id.* at 6–7.

[86] *See Hill*, 2020 WL 2542725, at *3. The Court also notes that determining that "extraordinary and compelling reasons" justify reducing Tidwell's sentence is consistent with the Sentencing Commission's policy statement that metastatic solid-tumor cancer constitutes a terminal illness that warrants a sentence reduction. *See* U.S.S.G. § 1B1.13, comment n.1.

**IV.     CONCLUSION**

Tidwell committed grave crimes and was accordingly sentenced to life imprisonment. However, Congress has recognized that changed circumstances, such as terminal illness or the totally unforeseeable COVID-19 pandemic, can justify compassionate release. Just two years ago, Congress passed the First Step Act with the intention of increasing the use of compassionate release. For the reasons explained at length above, Tidwell has shown that a case like his fits squarely within the statute and that compassionate release is warranted. An order will be entered.